Terry Gross (103878)
Adam C. Belsky (147800)
Monique Alonso (127078)
GROSS BELSKY ALONSO LLP
180 Montgomery Street, Suite 2200
San Francisco, California 94104
Telephone: (415) 544-0200
Facsimile:  (415) 544-0201

**E-filing**

Attorneys for Plaintiff
KEVIN MOY and the Proposed Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| KEVIN MOY,<br><br>   Plaintiff,<br><br>  v.<br><br>AIR NEW ZEALAND; ALL NIPPON AIRWAYS; CATHAY PACIFIC AIRWAYS; CHINA AIRLINES; EVA AIRLINES; JAPAN AIRLINES INTERNATIONAL; MALAYSIA AIRLINES; NORTHWEST AIRLINES; QANTAS AIRWAYS; SINGAPORE AIR; THAI AIRWAYS; and UNITED AIRLINES, INC.,<br><br>   Defendants. | CV 08 1383<br>Case No.<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE SHERMAN ANTITRUST ACT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Kevin Moy, individually and on behalf of the Class described below, brings this action for treble damages and injunctive relief under the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1 *et seq.*, and Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15 and 26, against defendants Air New Zealand, All Nippon Airways, Cathay Pacific Airways, China Airlines, EVA Airlines, Japan Airlines International, Malaysia Airlines, Northwest Airlines, Qantas Airways, Singapore Air, Thai Airways, and United Airlines, Inc. (collectively "Defendants") and alleges as follows:

## INTRODUCTION

1. Defendant airlines participated in a conspiracy to fix, raise, maintain, and/or stabilize the prices of long-haul transpacific passenger flights to and from the United States (Transpacific Passenger Air Transportation"), including by fixing the price of fuel surcharges included in those fares ("Fuel Surcharges"). Because of Defendants' unlawful conduct and conspiracy, plaintiff and others paid artificially inflated prices for these services. Plaintiff brings this class action on behalf of himself and all other persons and entities who purchased Transpacific Passenger Air Transportation from Defendants or their subsidiaries, agents, or co-conspirators, during the period from January 1, 2004, through August 31, 2007.

## JURISDICTION AND VENUE

2. This Court has original jurisdiction over this action under the provisions of 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (original jurisdiction over any claims arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies), because the Complaint alleges violations of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

3. Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b) and (c), because Defendants resided, had an agent, transacted business, maintained an office, or are otherwise found in this District. Moreover, many of Defendants' unlawful acts giving rise to Plaintiff's claim occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District because San Francisco International Airport is a major hub of the price fixing conspiracy alleged herein and is located in this District.

## INTRADISTRICT ASSIGNMENT

4. Intradistrict assignment is proper in this Division because a substantial part of the property that is the subject of this action is situated in, and a substantial part of the events or omissions which give rise to the claim occurred in, the Counties of San Francisco and San Mateo.

## THE PARTIES

5. Plaintiff Kevin Moy ("Plaintiff") is a resident of the State of California, County of San Francisco. Plaintiff purchased Transpacific Passenger Air Transportation from one or more of

1  Defendants during the class period. As a result of Defendants' unlawful conduct alleged herein,
2  plaintiff has suffered injury in fact and paid artificially inflated prices for Transpacific Passenger Air
3  Transportation.

4        6.      Defendant Air New Zealand is a New Zealand company with its principal place of
5  business in Auckland, New Zealand. Air New Zealand conducts Transpacific Passenger Air
6  Transportation, including to and from this District.

7        7.      Defendant All Nippon Airways is a Japanese company with its principal place of
8  business in Tokyo, Japan. All Nippon Airways conducts Transpacific Passenger Air Transportation,
9  including to and from this District.

10       8.      Defendant Cathay Pacific Airways is a Hong Kong company with its principal place
11 of business in Hong Kong. Cathay Pacific Airways conducts Transpacific Passenger Air
12 Transportation, including to and from this District.

13       9.      Defendant China Airlines is a Taiwanese company with its principal place of business
14 in Taipei, Taiwan. China Airlines conducts Transpacific Passenger Air Transportation, including to
15 and from this District.

16       10.      Defendant EVA Airways is a Taiwanese company with its principal place of business
17 in Taoyuan City, Taiwan. EVA Airways conducts Transpacific Passenger Air Transportation,
18 including to and from this District.

19       11.      Defendant Japan Airlines International is a Japanese company with its principal place
20 of business in Tokyo, Japan. Japan Airlines International conducts Transpacific Passenger Air
21 Transportation, including to and from this District.

22       12.      Defendant Malaysia Airlines is a Malaysian company with its principal place of
23 business in Selangor Darui Ehsan, Malaysia. Malaysia Airlines conducts Transpacific Passenger Air
24 Transportation, including to and from this District.

25       13.      Defendant Northwest Airlines is a Delaware corporation with its principal place of
26 business in Eagan, Minnesota. Northwest Airlines conducts Transpacific Passenger Air
27 Transportation, including to and from this District.

28 //

14. Defendant Qantas Airways is an Australian company with its principal place of business in Mascot, Australia. Qantas Airways conducts Transpacific Passenger Air Transportation, including to and from this District.

15. Defendant Singapore Airlines is a Singapore company with its principal place of business in Singapore. Singapore Airlines conducts Transpacific Passenger Air Transportation, including to and from this District.

16. Defendant Thai Airways is a Thailand company with its principal place of business in Bangkok, Thailand. Thai Airways conducts Transpacific Passenger Air Transportation, including to and from this District.

17. Defendant United Airlines, Inc. is a Delaware corporation, with its principal place of business in Chicago, Illinois. United Airlines, Inc. conducts Transpacific Passenger Air Transportation, including to and from this District. United Airlines, Inc. operates a hub and maintenance operation center at San Francisco International Airport, and is the largest employer in San Mateo County, which is located within this district.

18. Certain other persons, firms, corporations and entities, the identities of which Plaintiff is not currently aware of, have participated as co-conspirators with Defendants in the violations and conspiracies alleged in this Complaint. In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

19. The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, or representatives while actively engaged in the management of each of the Defendants' affairs.

## FACTUAL ALLEGATIONS

20. The relevant product market for purposes of this action is the market for Transpacific Passenger Air Transportation. The relevant geographic market is the United States.

21. Each Defendant possesses significant market share on their routes of travel for Transpacific Passenger Air Transportation. The principal competitors for the Defendants in the Transpacific Passenger Air Transportation market are one another.

22. Transpacific Passenger Air Transportation is a commodity product that is fungible in because a seat on one plane to a destination is a ready substitute for a seat on another plane to the same destination. As a result, airline fares are the primary factor driving customer choice between airlines.

23. The Transpacific Passenger Air Transportation market is highly concentrated, and substantial barriers exist to entry in this market. These two factors facilitated the implementation and maintenance of the horizontal price-fixing cartel by Defendants alleged in this Complaint.

24. Generally, surcharges are a feature of the global air transportation market, in which airlines charge extra fees to their customers, above and beyond basic flight rate charges, with the intent of defraying certain external costs of the carriers.

25. Beginning in 2004, or earlier, and continuing to at least August 2007, Defendants have combined and conspired to fix the prices of Fuel Surcharges added to Transpacific Passenger Air Transportation tickets above competitive levels.

26. Defendants were aware that their imposition of Fuel Surcharges and other surcharges would not be successful if their supposed competitors did not join them; otherwise, customers would be free to seek out lower prices. For this reason, Defendants entered into agreements to raise Fuel Surcharges at the same times and in the same amounts.

27. These uniform Fuel Surcharges do not reflect the airlines' actual fuel costs per flight because each airline has different purchasing strategies for fuel.

28. The collusion of Japan Airlines International and All Nippon Airways ("ANA") is representative of the behavior of the other Defendants. Japan Airlines International and ANA agreed to raise and lower fares on nearly always the same dates and were in lockstep on surcharges for transpacific fares:

(a) On June 8, 2004, ANA files a notice with the Japanese government to raise International Air Transport Association ("IATA") international fares, in the wake of increased fuel prices, to and from Japan, effective July 1, 5% hike, exception North America economy fares, but not business class. On June 8, 2004, Japan Airlines files a notice with the Japanese government to raise international fares, in the wake of increased fuel prices, to and from Japan, effective July 1, 5% hike, exception North

1  America economy fares, but not business class.

(b) On January 5, 2005, ANA announces it will add fuel surcharges on international fares on February 1, 2005. The surcharges for transpacific flights were 2,500 yen. On January 20, 2005, Japan Airlines announces it will add fuel surcharges on international passenger fares on February 1. The surcharges for transpacific flights were 2,500 yen.

(c) On June 3, 2005, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge effective July 1, 2005. June 7, 2005, ANA files a notice with the Japanese government to raise its international fuel surcharge effective July 1, 2005.

(d) On January 16, 2006, Japan Airlines files a notice with the Japanese government to raise its international fuel charge effective March 1, 2006. On January 23, 2006, ANA files a notice with the Japanese government to raise its international fuel surcharge, effective March 1, 2006.

(e) On August 17, 2006, Japan Airlines files a notice with the Japanese government to raise its international fuel surcharge, effective October 1, 2006, from 8,000 yen to 13,600 yen ($66 to $113). On August 31, 2006, ANA files a notice with the Japanese government to raise its international fuel surcharge, effective October 15, 2006, from 8,000 yen to 13,600 yen ($66 to $113).

(f) On November 16, 2006, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective January 1, 2007, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108). On November 16, 2006, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective January 1, 2007, lowering the surcharge from 13,600 yen to 13,000 yen ($113 to $108).

(g) On March 19, 2007, Japan Airlines files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective May 1, 2007, to 11,000 yen or $91. On March 20, 2007, ANA files a notice with the Japanese government to reduce the fuel surcharge on international passenger fares effective May

1, 2007, to 11,000 yen or $91.

(h) On May 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective July 1, 2007, from 11,000 yen or $91 to 12,000 yen or $100. On May 25, 2007, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective July 10, 2007, from 11,000 yen or $91 to 12,000 yen or $100.

(i) On August 15, 2007, Japan Airlines files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective October 1, 2007, from 12,000 yen or $100 to 13,000 yen or $108. On August 20, 2007, ANA files a notice with the Japanese government to raise the fuel surcharge on international passenger fares effective October 1, 2007, from 12,000 yen or $100 to 13,000 yen or $108.

29. Other Defendants acted similarly.

30. Defendants' executives, as well as other air carriers' executives, met formally or informally over the years at various trade meetings or meetings of trade associations, such as the International Air Transport Association, the Association of Asian Pacific Airlines, oneworld, Star Alliance and SkyTeam Alliance. At one or more of these meetings, Defendants conspired to artificially inflate Fuel Surcharges on Transpacific Passenger Air Transportation.

31. One of the keys to the conspiracy is the 42-year-old Association of Asia Pacific Airlines ("AAPA"). The 17-member trade association, based in Kuala Lumpur, Malaysia, is the most significant group representing Asia/Pacific carriers. The AAPA boasts that its "member airlines carry 285 million passengers and 10 million tonnes of cargo representing approximately one-fifth of global passenger traffic and one-third of global air cargo traffic respectively." Ten of the defendants are members of AAPA.

32. The primary purpose of AAPA is to serve as a forum for members' views on issues of common interest and to foster close cooperation. According to the organization, "AAPA speaks with a common voice on behalf of the Asia Pacific carriers and puts forward Asian perspectives when dealing with governments, aircraft manufacturers, airport authorities and other organizations on industry issues. The activities of the Association cover every aspect of civil aviation where the airlines

1  feel they can work together for mutual benefit. In addition, AAPA retains access to specialized legal
2  and aviation consultants in Brussels and Washington, a reflection of the significant impact which the
3  profusion of U.S. and E.U. regulatory developments have on all international carriers including Asia
4  Pacific airlines."

5      33.      AAPA sponsored an Aviation Emergency Response 2006 meeting on September 19-21,
6  2006, in Bangkok, Thailand. This meeting was attended by international airport officials and AAPA
7  member executives. Meetings were held on increasing revenues in the transpacific area by way of Fuel
8  Surcharges and other financial means.

9      34.      AAPA also organized an AAPA Forum, held November 28-29, 2006, in Bandar Seri
10 Begawan, Brunei Darussalam that was attended my more than 120 aviation industry stakeholders. At
11 this meeting, Defendants and others discussed Fuel Surcharges.

12     35.      Another key to the conspiracy is the Geneva-based International Air Transport
13 Association ("IATA"). All of the defendants are members of the IATA, which was founded in 1945
14 in Havana, Cuba. IATA represents more than 240 airlines comprising 94% of scheduled international
15 air traffic. It describes itself as "the prime vehicle for inter-airline cooperation."

16     36.      IATA held a Special Meeting in Geneva, Switzerland, on May 28, 2004, at which fuel
17 costs were the main topic of the meeting, and there were agreements on how to add surcharges for fuel.
18 The Montreal Gazette reported on June 1, 2004, that "member carriers of the International Air
19 Transport Association might raise international fares by as much as five percent to help cover a surge
20 in jet fuel costs. The proposed fare increase of between two percent and five percent was agreed at a
21 May 28 meeting of the association, which represents more than 270 airlines worldwide, an IATA
22 spokesperson said."

23     37.      At IATA's Annual General Meeting and World Air Transport Summit, held in
24 Singapore on June 6-8, 2004, more than 600 airline executives attended this annual summit. Giovanni
25 Bisignani, IATA CEO said in a welcoming statement: "While record high fuel prices challenge our
26 profitability it is time to put our efforts toward rebuilding the industry." Immediately following this
27 meeting, on June 8, 2004, as alleged above, both Japan Airlines International and ANA filed
28 applications with the Japanese government to raise international passenger fares because of high fuel

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

costs. In a news release announcing the Fuel Surcharge hike, Japan Airlines International said: "The application follows a special meeting of the members of the International Air Transport Association in Geneva, May 28, (2004) when a resolution was discussed to raise fares in the wake of increased fuel prices. This resolution has now been adopted."

38. Other industry meetings during the class period attended by executives of Defendants at which cartel-like activity was accomplished concerning Fuel Surcharges include:

(a) 2005 International Flight Services Association, Global Leadership Conference - Asia Pacific, August 30 - September I, 2005, Tokyo Japan: This meeting was labeled as "The Challenge of Change." Among the participants were: Makoto Fukada, Managing Director and Senior Vice President International Passenger, Japan Airlines; Sandra Pineau, Senior Director of Planning and Design, Continental Airlines; Charles Grossrieder, a manager at Cathay Pacific Airways; Nikom Raviyan, Vice President, Thai Airways; Sandeep Bahl, General Manager, Northwest Airlines, Shigeru Miyata, Vice President, Japan Airlines; Kriengsakdi Phatharacharukul, Director, Thai Airways; and Hee Won Jo, Senior Manager, Asiana Airlines.

(b) 2nd Annual Asia Pacific & Middle East Aviation Outlook Summit 2006, December 5-6, 2005, Kuala Lumpur, Malaysia: The theme of this meeting was "Towards Best Practice; Maximising Revenues and Minimising Costs." On the first day of the meeting, the guests included Dato Seri Bashir Ahmad, Malaysia Airport's CEO; Willy Boulter, Commercial Director for Virgin Atlantic Airways; and Stanley Kuppusamy, President, International Relations, Singapore Airlines. Fuel Surcharges were a topic of discussion.

(c) 3rd Annual Asia Pacific & Middle East Aviation Outlook Summit, November 9-10, 2006, Singapore: Participating in this meeting were executives from most of Defendants, including Geoff Dixon, CEO of Qantas and Huang Cheng Eng, Executive VP for Singapore Airlines. One of the issues presented and discussed was: "Fighting Costs: Fuel prices and managing risk exposure."

//

(d) Asia Pacific Aviation Summit, July 24-25, 2007, Sydney, Australia: This meeting was put on by the Asia Pacific aviation industry. Some of the issues discussed included the impact of the investigation by the U.S. Department of Justice into fare price fixing. Another topic was "working together efficiently" to diffuse the investigation of added surcharges.

39. In addition to the various alliances/trade groups to which they belong, various defendants are in effect business partners with each other through what is called code sharing. Code sharing is a business term which was first originated in 1990 when Qantas Airways and American Airlines combined services between an array of U.S. and Australian cities. Code sharing is a legal business arrangement. However, it provides a mechanism to conduct illegal activity, and on information and belief, Defendants utilized it here in furtherance of their illegal conspiracy.

40. The U.S. Department of Justice ("DOJ") started investigating air passenger fuel surcharge conspiracies worldwide in 2006, particularly transatlantic routes and transpacific routes to and from the West Coast. The DOJ announced on August 1, 2007, a $300 million settlement with British Airways and it cited passenger transatlantic routes. In its news release, the DOJ said: "The Department also charged that between August 2004 and February 2006, British Airways engaged in a conspiracy to suppress and eliminate competition by fixing the Fuel Surcharge charged to passengers on long-haul international flights, including flights between the United States and the United Kingdom."

41. The DOJ also focused on transpacific flights to and from the United States, noting that its investigation was "ongoing" and includes other airlines, including Defendants named in this Complaint.

42. The DOJ also announced a settlement with Korean Air for fare price fixing on flights from the United States to Korea. The DOJ stated that Korean Air has "agreed to cooperate with the Department's ongoing investigation." Korean Air's unnamed co-conspirator in the passenger fare price fixing via Fuel Surcharges was widely reported to be Asiana Airlines, which sought amnesty.

43. Under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, a company can apply for leniency from the Department of Justice for its participation in antitrust

activities. Under the so-called Corporate Leniency Program, if a company comes forward with information about antitrust activities and cooperates in the investigation, it is eligible for conditional amnesty from prosecution.

44. Both Korean Air and Asiana Airlines are among the top transpacific carriers in the world. It was not the first time Korean Air and Asiana Airlines have been implicated in collusion and anticompetitive behavior. The Korean Fair Trade Commission fined Korean Air and Asiana in 2001 for conspiring to set passenger air transportation services in Korea.

45. In addition, several of the Defendants and unnamed co-conspirators have been identified as targets and or subjects in international investigations by the U.S. Department of Justice and the European Union into air cargo fuel surcharge price fixing. The targets, many of which are also named in civil suits, include All Nippon Airways, American Airlines, Asiana Airlines, Japan Airlines, Korean Airlines, Northwest Airlines, Qantas Airways and United Airlines. In both the air passenger and cargo investigations, Defendants and other airlines are accused of developing and participating in conspiracies to increase revenue by assessing inflated Fuel Surcharges.

46. On August 13, 2007, Qantas Chief Executive Officer Geoff Dixon announced that Qantas Airways would set aside $40 million to cover a potential fine in the United States as a result of Fuel Surcharges and price fixing in its freight division. In a news release, Dixon was quoted as saying:

> "On 1 August 2007, the U.S. Department of Justice announced that British Airways and Korean Air had agreed to plead guilty and pay separate US$300 million criminal fines for their roles in conspiracies to fix prices of passenger and cargo flights. British Airways subsequently announced that US$200 million of its fine related to cargo. Based on these developments, a decision has been made to make a US$40 million (A$47 million) provision in the 2006/07 Financial Accounts."

Dixon also was quoted as saying: "We have investigated this issue thoroughly and are confident that the unacceptable conduct was limited to a small number of people."

47. On October 6, 2007, the Japanese daily newspaper *Asahi Shimbun* reported that Japan Airlines International would book a roughly $171 million charge for potential fines from a global price fixing probe by U.S. and European Union officials, stating:

> "The company's move comes after the U.S. Justice Department fined British Airways PLC and Korean Air Lines Co. $300 million each in August for fixing the prices of passenger and cargo flights with other airlines. The companies allegedly conspired to set fuel surcharges when oil prices rose."

48. The anti-competitive efforts of Defendants, and each of them, both collectively and individually, were done with the intent of making sure that none of the Defendants were disadvantaged by real competition. The Defendants freely and intentionally colluded to establish Transpacific Passenger Air Transportation rates. As a result of this collusion, plaintiff and the class paid more for Transpacific Passenger Air Transportation than they would have paid without this illegal conduct.

49. The above-alleged combination and conspiracy has had the following effects, among others:

(a) During the relevant period price competition in the sale of Transpacific Passenger Air Transportation by Defendants and their co-conspirators has been unlawfully restrained, suppressed and/or eliminated throughout the United States;

(b) During the relevant period prices for Transpacific Passenger Air Transportation sold by Defendants and their co-conspirators have been raised, fixed, maintained and stabilized at artificially high and noncompetitive levels throughout the United States; and

(c) During the relevant period purchasers of Transpacific Passenger Air Transportation from Defendants and their co-conspirators have been deprived of the benefit of free and open competition in the purchase of Transpacific Passenger Air Transportation.

//

50. Defendants, directly or through a division, parent, subsidiary or agent, have had actual knowledge of, and have knowingly participated in, the conspiracy to Transpacific Passenger Air Transportation.

51. The acts charged in this Complaint to have been done by Defendants were authorized, ordered and done by its officers, employees, agents, members or representatives while actively engaged in the management, direction, control or transaction of the business or affairs of each of the Defendants.

## CLASS ACTION ALLEGATIONS

52. Plaintiff brings this action both on behalf of himself, and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of the following class (the "Class"):

> All individuals and entities (excluding governmental entities, the Court and its staff, Defendants, Defendants' parents, predecessors, subsidiaries, and affiliates, and Defendants' co-conspirators) who purchased passenger air transportation for long-haul transpacific flights from any of the Defendants, their co-conspirators, or any predecessor, subsidiary, affiliate or business partner of Defendants or their co-conspirators, at any time during the period from May 1, 2004 to August 31, 2007 (the "Class Period").

53. Although Plaintiff does not know the exact number of Class members, since such information is the exclusive control of Defendants and their co-conspirators, Plaintiff is informed and believes, and on that basis alleges, that, due to the nature of the trade and commerce involved, Class members are sufficiently numerous, most likely tens of thousands of purchasers, and geographically dispersed throughout the United States such that joinder of all Class members is impracticable. The information as to the identity of the Class members can be readily determined from records maintained by Defendants and their co-conspirators and agents.

54. Plaintiff's claims are typical of the claims of the Class in that Plaintiff is a purchaser of Transpacific Passenger Air Transportation, all Class members were damaged in the same manner by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

55. Numerous questions of law and fact that are common to the Class arise from Defendants and their co-conspirators' anti-competitive conduct. Among those common questions of

law and fact are:

    a. Whether Defendant engaged in a contract, combination or conspiracy with its co-conspirators to raise, fix, maintain, peg or stabilize the prices of Transpacific Passenger Air Transportation, including the prices of Fuel Surcharges and other charges on Transpacific Passenger Air Transportation;

    b. The duration of the conspiracy and the nature and character of the acts done in furtherance of the conspiracy;

    c. The identities of the co-conspirators;

    d. Whether Defendants and their co-conspirators violated Section 1 of the Sherman Act;

    e. Whether Defendant and their co-conspirators actively concealed the contract, combination or conspiracy from Plaintiff and other Class members;

    f. Whether the conduct of Defendants and their co-conspirators caused prices of Transpacific Passenger Air Transportation to be artificially inflated to non-competitive levels; and

    g. Whether Plaintiff and other members of the Class were injured by the conduct of Defendants and their co-conspirators and, if so, the appropriate class-wide measure of damages and appropriate injunctive relief.

56. These common questions of law and fact are common to the Class, and predominate over any other questions affecting only individual Class members.

57. Plaintiff will fairly and adequately represent the interests of the Class in that Plaintiff is a typical purchaser of Transpacific Passenger Air Transportation and has no conflicts with any other member of the Class. Furthermore, Plaintiff has retained competent counsel experienced in antitrust and class action litigation.

58. This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

59. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant

14

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

and its co-conspirators.

60. Injunctive relief is appropriate as to the Class as a whole because Defendants and their co-conspirators have acted or refused to act on grounds generally applicable to the Class.

## FIRST CAUSE OF ACTION

**Conspiracy in Restraint of Trade in Violation of the Sherman Act, 15 U.S.C. § 1**
**(Against All Defendants)**

61. Plaintiff re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1- 60 above, as though fully set forth in this cause of action.

62. The business activities of Defendants and their co-conspirators concerning the sale of Transpacific Passenger Air Transportation were within and had a substantial effect on interstate commerce.

63. Beginning on January 1, 2004, or earlier, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in the Transpacific Passenger Air Transportation market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants and their co-conspirators combined and conspired to impose uniform Fuel Surcharges and other charges on Transpacific Passenger Air Transportation as a means to raise prices for their services, rather than to recover actual costs.

64. Defendants and their co-conspirators, by their unlawful conspiracy, artificially raised, inflated and maintained the market prices of Transpacific Passenger Air Transportation, as alleged above.

65. The contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of Transpacific Passenger Air Transportation they sold in the United States.

66. For the purpose of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined or

conspired to do, including:

    (a) Participating in meetings and conversations to discuss the prices of Transpacific Passenger Air Transportation;

    (b) Agreeing to manipulate prices and supply of Transpacific Passenger Air Transportation in a manner that deprived direct purchasers of free and open competition;

    (c) Issuing price announcements and price quotations in accordance with the agreements reached; and

    (d) Selling Transpacific Passenger Air Transportation to customers in the United States at non-competitive prices.

67. As a direct and proximate result of Defendants and their co-conspirators' wrongful acts, Plaintiff and the Class have been injured in their business and property in an amount according to proof at trial, and are entitled to treble damages from Defendants and their co-conspirators pursuant to 15 U.S.C. § 15.

68. Plaintiff is informed and believes, and thereon alleges, that, Defendants and their co-conspirators, unless restrained, will continue with their conspiracy alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, their co-conspirators, and each of them, as follows:

1. For a declaration that this action is a proper class action under Federal Rules of Civil Procedure, Rule 23(b)(3), on behalf of the Class as defined herein, and an Order directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each member of the Class;

2. For a declaration that the unlawful combination and conspiracy alleged herein is an unreasonable restraint of trade of commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3. For a preliminary and permanent injunction enjoining Defendants, their co-conspirators, and all persons acting for, with, by, through, or under them, and each of them from further commission

1  of the unlawful combination and conspiracy alleged herein;

2      4.    For damages to Plaintiff and the Class, and treble those damages under 15 U.S.C. § 15;

3      5.    For all costs and expenses of suit of Plaintiff and the Class, including reasonable attorney's fees; and

5      6.    For such other and further relief as the Court may deem just and proper.

Dated: March 11, 2008

                                              GROSS BELSKY ALONSO LLP

                                              By: _____
                                                      Adam C. Belsky

                                              Attorneys for Plaintiff KEVIN MOY
                                              and the Proposed Class

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury as to all issues triable by a jury.

Dated: March 11, 2008

GROSS BELSKY ALONSO LLP

By: _____
Adam C. Belsky

Attorneys for Plaintiff KEVIN MOY
and the Proposed Class